DECISION
Plaintiffs appeal Defendant's denial of their application for farm use special assessment for the 2007-08 tax year. Trial was held in the courtroom of the Oregon Tax Court in Salem on October 18, 2007. Plaintiffs appeared pro se and testified on their own behalf. The court also allowed Plaintiffs to call as a hostile witness, Dave Bernards (Bernards), the county farm appraiser who visited the subject property and recommended denial of Plaintiffs' special assessment application. Defendant was represented by Scott Norris, Assistant County Counsel. Testifying for Defendant were Glen White, Senior Appraiser, Marion County Assessor, Rural Farm Section; and, Art Stinson, Code Enforcement Officer, Marion County Public Works.
 I. STATEMENT OF FACTS
The subject property is a three-acre parcel improved with Plaintiffs' personal residence, shop building, and a barn. It is identified in the assessor's records as Account No R35582. Plaintiffs, who are retired, have owned the property for over 30 years. The property is not zoned for exclusive farm use, but, under Oregon law, may qualify for special assessment if it is used exclusively for farming and generates sufficient income.
On January 29, 2007, Plaintiffs applied for farm use special assessment on two of the three acres they own at the subject address. Their application concerned the 2007-08 tax year. *Page 2 
Defendant denied Plaintiffs' application because "[t]he property is not currently employed with a typical and reasonable farming activity." (Ptfs' Ex 16.) Plaintiffs timely appealed that determination to this court.
At trial, both parties submitted a considerable number of exhibits. Plaintiffs' exhibits consist of 25 photographs of the subject property, various applications for special assessment and "exempt" building permits, profit and loss statements Plaintiffs created using popular computer accounting software, receipts for farm expenses incurred in 2007, the assessor's special assessment denial letter, the appraiser's field notes pertaining to that denial, and the pleadings and certain other documents related to their appeal to this court. There was some testimony by Mr. and Mrs. Stacy about their current and planned future use of the subject property. Plaintiffs did not specifically address the majority of their exhibits, focusing instead on Defendant's photographs and other exhibits.
Plaintiffs insist they are farming roughly two acres of their property, and that the third acre is set aside for their homestead. Mr. Stacy testified that his farming operations include the boarding of two horses, the stabling of his own stallion, which is said to be available for breeding (generating "stud" fees), and the growth and consumption of fruit, vegetables, and berries. Mr. Stacy further testified that his farm includes three separate pasture areas, one used only for the stallion, another for boarded horses, and the third area for unspecified grazing. At least two of those three areas are not entirely enclosed by fencing.
Defendant's exhibits consist almost entirely of photographs of the subject property. Those pictures were taken either by Dave Bernards, the county farm appraiser that visited the subject property, or by Art Stinson, the county code enforcement officer that visited Plaintiffs' property regarding a code enforcement matter currently pending before another tribunal. Defendant *Page 3 
offered very little direct testimony. Defendant's witnesses were called primarily to authenticate the photographs. The photographs were intended to show the court that there is little or no farming activity taking place on the property. The photographs depict a considerable number of trees (mainly oaks) and underbrush, particularly at the front end of the property nearest the road, and a lot of what appears to be debris strewn about the property (including several vehicles parked amongst overgrown blackberry bushes and under trees, several old trailers or pieces of trailers, bricks, barrels, several large trucks that may or may not be operable, piles of lumber and brush, more piles of lumber and old windows, wooden boxes, and a lot of unidentifiable "stuff").
Plaintiffs contend that their property is operated as a farm, in conjunction with three other properties they own, and that they meet the statutory income requirements for special assessment. Defendant contends that the subject property is not used "exclusively for farm use," and that Plaintiffs are not utilizing "accepted farming practices," as required by administrative rule.
 II. ANALYSIS
A. Statutory Requirements for Special Assessment
Property that is not within an exclusive farm use zone must satisfy the requirements of ORS 308A.068[1], ORS 308A.071, and ORS 308A.056 to qualify for farm use special assessment. Special assessment has several monetary advantages. One is a reduction in property taxes because the property is valued at a lesser amount. Another is a reduction in certain building fees based on approval of an application for exempt status for certain qualifying farm-related structures (discussed below). *Page 4 
ORS 308A.068 provides generally for special assessment on non-exclusive farm use (non-EFU) zoned property. That statute provides in relevant part:
 "(1) Any land that is not within an exclusive farm use zone but that is being used, and has been used for the preceding two years, exclusively for farm use shall qualify for farm use special assessment:
 "(a) If the land meets the income requirements set forth in ORS 308A.071; and
 "(b) Upon compliance with the application requirements set forth in ORS 308A.077."
ORS 308A.068 (emphasis added).
The annual gross income requirement for a two-acre farm operation is $650. ORS 308A.071(2)(a)(A).
The term "farm use" is defined in ORS 308A.056(1) as:
 "the current employment of land for the primary purpose of obtaining a profit in money by:
 "(a) Raising, harvesting and selling crops;
 "(b) Feeding, breeding, managing or selling of livestock * * *;
 "* * * *
 "(d) Stabling or training equines, including but not limited to providing riding lessons, training clinics and schooling shows;
 "* * * *
 "(f) On-site constructing and maintaining equipment and facilities used for the activities described in this subsection;
 "(g) Preparing, storing or disposing of, by marketing or otherwise, the products or byproducts raised for human or animal use on land described in this section; or
 "(h) Using land described in this section for any other agricultural or horticultural use or animal husbandry or any combination thereof."
(Emphasis added.) *Page 5 
The Department of Revenue (department) has promulgated an administrative rule that provides in part: "[t]he assessor must consider all the requirements of ORS 308A.056 and must be convinced that not only such requirements are met but, in addition, the land must be used in a manner that is reasonably designed and intended to give rise to a profit in money by accepted farming practices." OAR 150-308A.059(2)(b). The term "accepted farming practice" is defined in ORS 308A.056(4)(a) as "a mode of operation that is common to farms of a similar nature, necessary for the operation of these similar farms to obtain a profit in money and customarily utilized in conjunction with farm use." Moreover, the administrative rule states "[i]f the primary purpose of the current use of the land is not to obtain a profit in money, the land is not farm use land. This primary purpose must be ascertained from overt acts." OAR 150-308A.059(2)(b). Among the factors the assessor must consider are "[u]ses of the land for other than farming operation." OAR 150-308A.059(2)(b)(H).
To summarize the relevant requirements of the statutes and rules set forth above, ORS 308A.068(1) requires that the land be used "exclusively for farm use," described in ORS 308A.056(1) as "the current employment of land for the primary purpose of obtaining a profit in money" by engaging in one of a number of farming activities that include raising and selling crops and stabling horses, and, under OAR 150-308A.059(2)(b), the use of the land must be "reasonably designed and intended to give rise to a profit in money by [utilizing] accepted farming practices."
B. Plaintiffs' Use of the Property
Plaintiffs use of the property can be divided into two categories: horse operations, and the growing and harvesting of farm crops. *Page 6 
1) Horses
Plaintiffs live on the subject property and, in their testimony, describe it as their "home base." Plaintiffs contend that they boarded two horses on the property in 2005 and 2006, and reported an income of $1,625 in 2005, and $1,171.25 in 2006. (Ptfs' Exs 6.1; 7.1) One of those horses is owned by Plaintiffs' son, and the other by their granddaughter. Neither the son nor the granddaughter testified. According to testimony, the granddaughter, who lives in Mollala, sold her horse sometime in the middle of calendar year 2006.
Bernards, the county farm appraiser, testified that he observed only one small horse on the property when he was there in January 2007. That horse was apparently Plaintiffs' stallion. Plaintiffs offered no explanation as to the whereabouts of any boarded horses. The granddaughter's horse would have been sold and therefore not present on the property, but the son's horse should have been on Plaintiffs' property, absent an explanation of its whereabouts elsewhere.
Plaintiffs testified that they have a stallion that is available for breeding. Plaintiffs submitted a photograph of Mr. Stacy standing next to that animal. However, Plaintiffs offered no testimony about the actual use of the stallion for breeding and, when questioned by the court, Mr. Stacy testified that he has not earned any stud fees from the stallion. On further inquiry by the court, Mr. Stacy testified that he has owned the stallion for 17 years. The court takes that testimony to mean that Plaintiffs have never bred their stallion during their 17 years of ownership. Thus, the only income Plaintiffs report from their equine business is from the boarding of two horses in 2005 and 2006, one of which was sold midway through 2006. The other horse is unaccounted for as of January 2007, and Plaintiffs offered no testimony as to what, if any, boarding activities they will undertake in 2007. *Page 7 
Mrs. Stacy testified that Plaintiffs have a business plan involving expanded equine boarding, which they project will generate $60,000 annually. Plaintiffs also anticipate breeding their stallion in the future. The statute, however, requires "current employment" of the land for farming. ORS 308A.056(1).
2) Fruits, Berries, and Vegetables
Plaintiffs have crops as well as equines. There are blackberry vines growing at the rear of their property along the fence line. Mr. Stacy contends that he takes care of the blackberries and harvests a crop each year. The court accepts that the vines produce berries, but the photographs lead the court to conclude that the berries are growing in their natural state (i.e., wild and uncared-for). Anyone who has taken a ride around the Oregon countryside has observed that berries grown commercially are typically "trained" to grow horizontally along wires or other support structures held in place by vertical posts. That process requires annual trimming to remove unwanted shoots and old canes. Plaintiffs did not refute Bernards' testimony that the berries are not "trained," and there is no evidence of such from the photographs. Nor is there any evidence that Plaintiffs planted the blackberries; they appear instead to be a gift from nature welcomed by some and despised by others as an unwanted intrusion and a visual blight.
Plaintiffs also grow apples on their property. Plaintiffs submitted a photograph depicting a half dozen or so crates of apples. (Ptfs' Ex 1.9.) Mr. Stacy testified that he has four apple trees, at least some of which he planted, and that he sprays and trims the trees. No details were provided as to the nature of Plaintiffs' care for their trees.
The number of trees on Plaintiffs' property is in dispute. Bernards testified that Mr. Stacy was only able to show him one apple tree and a non-grafted walnut tree during Bernards' site visit to the subject property. Only one tree is shown the photographs, and the *Page 8 
court concludes that Plaintiffs have just that one tree. That tree is growing in fairly close proximity to Plaintiffs' home in an area Plaintiffs described as their "homestead." That is significant because Plaintiffs are seeking special assessment on only two acres, exclusive of their one-acre homesite. Plaintiffs never actually identified the two acres for which they seek special assessment, and their testimony about the location of the tree in relation to the farmland versus the homestead was equivocal.
Bernards testified that Plaintiffs' walnut tree would not produce edible walnuts because it is not a grafted species. Mr. Stacy refutes that claim, insisting that the tree produces edible black walnuts. There is no independent evidence to corroborate Mr. Stacy's testimony but, in the end, resolution of the question is unnecessary, as will become increasingly apparent in the balance of the court's decision.
The final use of the property for farming is Plaintiffs' garden. There is disagreement between Bernards and Mr. Stacy as to the size of the garden, but it is at most 50 by 70 feet, and perhaps only half that size. Plaintiffs personally consume the vegetables they grow. The same is true for the apples, walnuts, and berries. Personal consumption of crops grown on the property does not preclude farm use special assessment. See ORS 308A.071(7)(b) (providing that "`gross income' includes the value of any crop or livestock that is used by the owner personally.") What is required, is bona fide farming.
C. Analysis of Facts and Law
The court is not persuaded that Plaintiffs are using the disputed two acres "exclusively" for farm use, as required by ORS 308A.068(1), or that "the current employment of land [is] for the primary purpose of obtaining a profit in money," as required by ORS 308A.056(1). The court finds that the primary use of Plaintiffs' property is residential, with incidental hobby farming. *Page 9 
Moreover, Plaintiffs have not persuaded the court that they are utilizing "accepted farming practices," per OAR 150-308A.059(2)(b). Bernards testified that there is only a perimeter fence around the property and that he did not observe any evidence of farm activity.
The difficulty in this case stems, at least in part, from differences in perspective and understanding between casual farm type activities and the statutory requirements for reduced property taxes due to profit motivated and accepted farm activities. Plaintiffs have a family garden plot, an apple tree (perhaps several), and a row of blackberry bushes growing wild along their back fence. They grow vegetables, apples, and blackberries, which they personally consume. Plaintiffs' son and granddaughter each owned a horse for a period of time and allegedly kept their horse at Plaintiffs' "farm." At least one of those horses was sold in 2006 and did not graze on Plaintiffs' property in 2007, the year for which special assessment is sought. The court is not sufficiently persuaded that Plaintiffs actually charged their relatives for the boarding of the horses, to the extent that such boarding took place on the subject property. Receipts or cancelled checks, coupled with testimony from either of the two boarders would have bolstered Plaintiffs' testimony. Moreover, Plaintiffs own other property and the court is not convinced that the horses were not boarded on one of those other properties.
Plaintiffs report monthly boarding fees of $125 per month per horse; one horse (the granddaughter's) from April through August 2005, two horses from September 2005 through April 2006, and one horse (the son's) in May 2006. (Ptfs' Ex 6.1; 7.1) That is a considerable sum of money to charge family members to board horses on a property with little or no pasture, no shelter, and no arena or other area in which to ride the horses. Plaintiffs did not submit any receipts or bank records to substantiate the monthly payments they purportedly received for the horse boarding. Nor did the son or granddaughter testify to substantiate their alleged payments. *Page 10 
Plaintiffs did submit a federal Schedule F used to report farm income for income tax purposes, but they did not submit their federal tax return and, therefore, there is no proof that the income reported on that form appeared on their federal tax return.
Moreover, there is a discrepancy in Plaintiffs' records regarding income earned from boarding. The special assessment application Plaintiffs filed reports income of $1,171.25 from the boarding of horses, but the Schedule F reports only $1,000 in gross income from farming. The explanation for the disparity was illogical, Mrs. Stacy explaining that she did not have complete information when one of the forms was completed, but Mr. Stacy insisted that the information on the special assessment application was correct. That application was completed in January 2007 before Plaintiffs' 2006 tax return was prepared, and one would assume Plaintiffs had better information later in 2007 when they were preparing their federal income tax return than they had in January 2007 when they were filling out their special assessment application. Thus, if either figure is wrong it should be the one on Plaintiffs' special assessment application, not the later-prepared tax return.
As for Plaintiffs' 17-year-old stallion, Plaintiffs do not purport to have earned any money from breeding that animal, and it does not appear that they have used the horse for breeding to date. Such plans appear to be prospective. The activities pertaining to that animal are therefore irrelevant for purposes of the special assessment request because the stallion has not been used for any income producing activity and appears, instead, to be a pleasure horse. Moreover, there is a problem with the evidence that causes the court to question whether that horse is, in fact, boarded at the subject property. Plaintiffs claim that they pasture the stallion in the field at the rear end of their property. However, it does not appear to the court that the field is entirely fenced on all four sides. Bernards testified that there was no cross fencing to keep a horse from wandering about *Page 11 
the rest of the property, whereas Mr. Stacy insists there is cross fencing, but that he had taken down a portion of the fencing so that he could store an old mobile home in the field for the winter. Plaintiff did more recently construct a barn for that animal, and it may well be stabled at the subject property henceforth.
Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. Plaintiffs have not met their burden.
There is a good deal of debris strewn variously around Plaintiffs' property, and perhaps a half dozen old cars and trucks, and numerous trailers. Much of Plaintiffs' property is covered with trees and brush, and the vehicles, etc., mentioned previously, leaving little area for the grazing of animals. That is particularly true of the area where Mr. Stacy testified that the two boarded horses were pastured. Nor was there a building for those animals to take shelter from the elements. There is no evidence that Plaintiffs till or disk the fields they describe as "pasture," and there is a good deal of brush and other debris in those fields. There is disagreement between the witnesses as to whether the numerous vehicles parked throughout the property are operable or currently licensed, but many of them appear to be in a state of serious disrepair.
Mr. Stacy candidly testified that the reason he is seeking farm use special assessment is to save several thousand dollars in fees associated with the construction of a farm-related building he plans to erect on the subject property. If the court understands the parties' testimony, applicable laws exempt certain qualifying farm-related structures from at least some of the building code requirements, which has the effect of reducing applicable fees for the construction of such buildings. Qualifying buildings include agricultural buildings on commercial farms and equine facilities, provided that the property is under a farm use special assessment program. (See Ptfs' Ex 15.) Plaintiffs have already erected one outbuilding on the subject property under the *Page 12 
favorable permit exemption provisions, but were more recently denied exemption for another building because they are not under farm use special assessment. It was that denial that prompted Plaintiffs to apply for farm use special assessment.
Plaintiffs testified that the subject property is operated as part of an integrated farm unit. ORS 308A.059 and the corresponding administrative rule, OAR 150-308A.090(1), recognize that a farm operator may have several parcels operating as a "farm unit," and that the assessor must consider the overall enterprise when evaluating an application for special assessment. In this case there is insufficient evidence for such an evaluation. Moreover, Plaintiffs' special assessment application referred only to the subject property.
Plaintiffs submitted photographs of other area farm properties with vehicles and farm equipment parked in the yard. Those photographs were accepted over Defendant's objection. Plaintiffs' intent in submitting those pictures was to persuade the court that it is common for farmers to park vehicles in their fields. It is not clear whether that argument is intended to persuade the court that Plaintiffs are involved in "accepted farming practices," as required by the administrative rule. What those pictures do show, however, are more serious and professional farm operations.
 III. CONCLUSION
After careful review of the evidence, the court concludes that Plaintiffs are not entitled to farm use special assessment for the subject property for the 2007-08 tax year, because they have not established that the property was used exclusively for farm use. The court concludes that the primary use of Plaintiffs' property is residential, with incidental hobby farming not undertaken for the primary purpose of obtaining a profit in money. Now, therefore, *Page 13 
IT IS THE DECISION OF THIS COURT that Plaintiffs' request for farm use special assessment for the 2007-08 tax year, for property identified as assessor's Account No R35582, is denied for the reasons set forth above.
Dated this _____ day of January 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinson on January 31,2008. The Court filed and entered this document on January 31,2008.
[1] All references to the Oregon Revised Statutes (ORS) are to 2005. *Page 1